IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ARTHUR W. HUGHES,                    )
                                     )
              Plaintiff,             )
                                     )
         v.                          )      1:12CV717
                                     )
B/E AEROSPACE, INC.; MARK B.         )
DOWTY; MARK I. VAUGHAN; and          )
SUZANNE K. HELMICK,                  )
                                     )
              Defendants.            )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

    Before the court in this employment action are motions for
summary judgment pursuant to Federal Rule of Civil Procedure 56
filed by all Defendants.  Defendant B/E Aerospace, Inc. ("B/E"),
moves for summary judgment on Plaintiff Arthur W. Hughes' claims
of interference and retaliation in violation of the Family and
Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.,
age discrimination in violation of the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., disability
discrimination in violation of the Americans With Disabilities
Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., and wrongful
discharge in violation of North Carolina's public policy against
age discrimination, as embodied in N.C. Gen. Stat. § 143-422.2.
(Doc. 33.)  Defendants Mark B. Dowty, Mark I. Vaughan, and
Suzanne K. Helmick (collectively the "individual Defendants"),

all employees of B/E, move for summary judgment on the FMLA claims against them. (Doc. 35.) For the reasons stated herein, both motions will be granted.

## I.   BACKGROUND[1]

### A.   Hughes' employment with B/E

B/E is a Delaware corporation with a place of business in Winston-Salem, North Carolina. (Doc. 16 ¶ 3.) It is engaged in the business of manufacturing aircraft cabin interior products. (Id.) During the relevant period, Defendant Dowty was B/E's Director of Engineering (Dowty Dep. at 10),[2] Defendant Vaughan was its head of sales and marketing department (Vaughan Dep. at 7),[3] and Defendant Helmick was its human resources ("HR") manager in the seating products group (Doc. 37-9 at 2).

Hughes was hired by B/E on January 21, 2008, as a project engineer in the research and development department of the seating products group in the Winston-Salem office. (Doc. 1 ¶ 7; Doc. 16 ¶ 7.) Though Hughes is a licensed professional engineer, he had no experience in the aerospace industry prior

---

[1] A substantial portion of Hughes' factual briefing fails to cite to the record, in violation of Local Rule 7.2(a)(2). A party should not expect a court to do the work that it elected not to do.

[2] Dowty's deposition, portions of which were submitted by Hughes, B/E, and the individual Defendants, is located at Docs. 37-2 and 38-2 and will be cited as "Dowty Dep."

[3] Vaughan's deposition, portions of which were submitted by Hughes, B/E, and the individual Defendants, is located at Docs. 37-5 and 38-3 and will be cited as "Vaughan Dep."

to his employment at B/E. (Hughes Dep. at 37.)[4] Hughes' supervisors in this position were Steve Hastings and Steve Kash. (Id. at 86.) Hughes performed acceptably at first; Kash presented him with a monthly award in February 2009. (Doc. 38-5 (noting that Hughes performed "at a high level" and "has done a great job").) Yet his supervisors rated his performance during the calendar year 2008 at 2.8 on a 4.0 scale (just below the "meets expectations" level, and above the "needs further development" level of 2.0).[5] (Doc. 37-13.) Additionally, Hughes began attending night classes and working toward a Master's degree in Business Administration ("MBA") at Wake Forest University in August 2008. (Hughes Dep. at 38.) Pursuant to a written agreement between Hughes and B/E, B/E reimbursed the entirety of Hughes' tuition payments. (Id. at 39.) Hughes successfully completed the program in August 2010. (Id. at 38.)

In the summer of 2009, Hastings approached Hughes about the possibility of transitioning into the sales and marketing department. (Id. at 88.) According to Hughes, Hastings told him he was doing a good job, and he told Hastings he was interested in the transfer. (Id.) Not long after this

---

[4] Hughes' deposition, portions of which were submitted by Hughes, B/E, and the individual Defendants, is located at Docs. 37-1, 38-1, and 40-1 and will be cited as "Hughes Dep."

[5] Hughes' "Interim Employee Evaluation Form," completed by Hastings and covering the 90-day period ending on April 21, 2008, rated his performance as a 2.9 on the same 4.0 scale. (Doc. 37-12; Hughes Dep. at 86.)

conversation, Hughes moved into sales and marketing. (Doc. 37-16 at 3.)[6] Thereafter, Hughes reported directly to Dowty (Hughes Dep. at 10, 86, 88), and his job title was project engineer (Doc. 37-16 at 1). Dowty reported to Vaughan, who was head of the department. (Dowty Dep. at 12.)

Under Dowty's supervision, Hughes' job responsibilities consisted primarily of responding to requests for quotes ("RFQs") that B/E received from account managers representing air carriers and air framers, such as Boeing and Airbus. (Hughes Dep. at 54.) Hughes then developed a layout of passenger accommodations, which is essentially the seating arrangement for an aircraft. (Id.) He was also responsible for ensuring that the products complied with Federal Aviation Regulations. (Id.) Specifically, Hughes' job was to handle this process for four B/E product lines for narrowbody aircraft: Spectrum, Pinnacle, Icon, and Millennium. (Id. at 53.)

Soon after Hughes transitioned into Dowty's group, his workload increased substantially and he began having trouble staying on pace. (Id. at 63.) Although the number of RFQs was increasing for everyone in the group, Hughes perceived that his workload was increasing at a faster rate than that of his coworkers. (Id. at 63-64.) He based this perception on a board

[6] Dowty noted on Hughes' 2009 performance appraisal that Hughes transitioned into his current role, in the sales and marketing department, in the second quarter of 2009.

maintained in the department that posted incoming RFQs. (Id.) According to "a physical snapshot of the boards," many of the incoming RFQs were related to narrowbody aircraft and had Hughes' name beside them. (Id. at 64.)

Around this time, Hughes began visiting a series of physicians for symptoms he described as "[c]ognitive issues, short-term memory loss, inability to concentrate, irritability, [and] daytime sleepiness." (Id. at 47.) These symptoms were causing him to fall behind in what he described as a "fast-paced job" and struggle with his assignments in school. (Id. at 49.) Hughes first visited his primary care physician, Dr. Metheney, reporting that he was having difficulty sleeping. (Id. at 48.) Dr. Metheney ordered a sleep study, referring him to Carolina Sleep Medicine in September of 2009. (Id.; Doc. 37-11 at 5.) The results of the study were inconclusive because Hughes was unable to fall asleep. (Hughes Dep. at 52; Doc. 37-11 at 5.) On the day of the sleep study, Hughes arrived at work at around noon and reported to Dowty that he participated in a sleep study but did not share any diagnosis at that time. (Hughes Dep. at 52.) Subsequently, Hughes informed Helmick via e-mail on November 18, 2009, that he had been diagnosed with a condition known as hypoxia[7] and that the condition was beginning to affect

---

[7] Hypoxia refers to "a deficiency of oxygen reaching the tissues of the body whether due to environmental deficiency or impaired respiratory

his quality of work. (Doc. 38-7 at 1.)[8] Dowty also testified that Hughes first told him sometime during the fall of 2009 that he was having trouble sleeping and experiencing stress. (Dowty Dep. at 44.)

On January 21, 2010, Hughes again initiated e-mail communications with Helmick regarding his medical condition. (Doc. 37-9 at 2.) Hughes indicated that he had consulted with a physician over the Christmas holiday and that the physician had prescribed medication to help treat his increased stress levels at work. (Id.) Hughes further stated that he "felt it was necessary to inform [Dowty] that [Hughes'] heightened stress level was now being addressed with medication." (Id.) He asked for information about "the company's policy regarding employee health conditions and job performance" and indicated that a meeting between himself, Dowty, and Helmick was scheduled for the following Monday, January 25. (Id.) In response, Helmick stated the company's policy of complying with the ADA and FMLA and explained some of the requirements of those statutes. (Doc. 37-10.) She also confirmed the January 25 meeting, writing "[i]t is my understanding that you, Mark Dowty and I will be

and circulatory organs." Webster's Third New International Dictionary at 1117 (1986).

[8] Hughes testified that Dr. Metheney, as opposed to the doctors he visited subsequently, diagnosed his hypoxia. (Hughes Dep. at 49.)

6

meeting on Monday to discuss your situation in order for all of us to explore potential options." (Id.)

At the meeting, Hughes requested to be removed from three of the four product lines for which he was responsible, leaving him with only the Spectrum line, which he viewed as his main focus. (Hughes Dep. at 159–60.) Dowty denied this restructuring because it would not be feasible and would create an unnecessary burden on Hughes' coworkers. (Helmick Dep. at 23.)[9] Helmick proposed other possible accommodations: she asked if Hughes thought that either suspending his MBA studies or taking a leave of absence would be helpful. (Id.; Hughes Dep. at 167.) Hughes rejected both options. (Helmick Dep. at 23; Hughes Dep. at 167.) Helmick also talked with Hughes about possibly moving into a manufacturing engineer or process engineer role in another group or department; although Hughes expressed some willingness to transfer, there were no positions open in the company in those areas at the time. (Helmick Dep. at 23–24.)

In February 2010, Dowty scored Hughes' performance during the calendar year of 2009 at 1.7 out of a possible 4.0, below the "needs further development" threshold of 2.0. (Doc. 37–16 at 6.) Hughes received a rating of 1, or "does not meet

---

[9] Helmick's deposition, portions of which were submitted by Hughes, B/E, and the individual Defendants, is located at Docs. 37–4 and 38–4 and will be cited as "Helmick Dep."

expectations," in the category of "Job Knowledge." (Id. at 3.) Dowty commented: "Art transferred into this team in summer 2009 with high expectations due to his assumed experience and academic proficiency. . . . Art has failed to develop into the asset envisioned." (Id. at 10.) Dowty also indicated that a Performance Improvement Plan ("PIP") had been developed "to allow Art to rapidly improve performance and become successful in this position." (Id.)

Hughes was permitted to comment on the evaluation in a space provided on the last page. He stated that his job performance issues were being caused both by his health issues (characterized as a "[b]reathing disorder resulting in insomnia" as well as "[g]eneral anxiety") and his lack of qualifications relating to his job function. (Id. at 11.) Specifically, he wrote that he was "lacking experience and specialized knowledge," that the product lines he was responsible for were "specialized in nature and reside in a niche market," and that he had received no formal training for the position. (Id.) Regarding his health issues, he noted that he remained on medication for anxiety, that he continued under the care of a physician for both insomnia and anxiety, and that the root cause of the breathing disorder was unknown, "with treatment being one of an indefinite timeline." (Id.) He further commented that he observed some improvement as a result of the treatment, that he

had requested either a modification of his job responsibilities or a transfer to a more low-stress job, and that he expected his PIP to take effect about February 22, 2010. (Id.)

Regarding Dowty, Hughes wrote that he "found many of the performance review comments from [Dowty] both lacking sensitivity and degrading, [but Hughes was] anticipating that [Dowty's] education about [Hughes'] impairments will improve [Dowty's] lack of sensitivity . . . ." (Id.) Specifically, Hughes testified in his deposition that Dowty assumed a negative tone and demeanor during the review process, threatening to involve Vaughan and Helmick because he did not feel that Hughes was cooperating. (Hughes Dep. at 142.) Dowty once told Hughes to "shut up" after Hughes brought up an objection to something in the evaluation and commented "you don't look sick to me" before the review process began. (Id. at 140–41, 143.)

As outlined in the evaluation, Hughes was placed on a PIP beginning on February 22, 2010. (Doc. 37–20.) The PIP identified five areas of deficiency relating to Hughes' job performance and assigned Hughes a different mentor for each area to help him reach a satisfactory level of performance. (Id.) As part of Hughes' development, the PIP required Hughes to sit for five examinations or assessments and score at acceptable

levels.  (Id. at 1-2; Dowty Dep. at 69.)[10]  The individual mentors in each area were responsible for designing the tests, but Dowty and HR drafted and approved the PIP.  (Dowty Dep. at 49-50.)  In a final section, titled "Consequences," the PIP stated that Hughes was required to meet with Dowty weekly to review his progress, that his progress would be formally documented in 30 days, and that failure to meet the expectations set out in the PIP could result in termination.  (Doc. 37-20 at 3.)

On March 23, 2010, Hughes received a memorandum from Dowty containing his 30-day progress report.  Dowty commented:

> Noticeable progress has been made towards correcting the areas of deficiency identified in [the PIP].  Some areas continue to require additional work and additional time is required to address other areas more completely.  Generally your progress has been acceptable and on-track with expectations.

(Doc. 37-21 at 1.)  However, the PIP still required Hughes to sit for three additional examinations.  (Id. at 1-2.) Subsequently, he received another memorandum on June 7, 2010, reviewing the 60 days that had passed since the issuance of the first progress report.  (Doc. 37-22.)  There, Dowty wrote, "[i]nitial progress you made in the first 30 days has not been followed with an equivalent level of progress."  (Id. at 1.)

_____

[10] The PIP did not require Hughes to sit for examinations relating to each of the five areas of deficiency, but rather included two examinations in each of the first two areas and one in the third area. (Doc. 37-20 at 1-2.)

Specifically, Hughes was given three attempts to take the "certification application quiz," one of the examinations required by the PIP. (Id. at 2.) Dowty stated that "[y]our third attempt on the exam only served to underscore your lack of comprehension of the basic certification application principles needed for [the] position." (Id.) Hughes scored a 38% on the examination, supporting a conclusion that "there is insufficient evidence to support a notion that [Hughes'] engineering estimates for programs involving a certification program would be optimized or valid." (Id.) The update included a warning that Hughes could be terminated within 30 days should his performance not meet expectations. (Id. at 1.)

In his deposition, Hughes expressed objections to certain aspects of the PIP evaluations. Although he admitted that some of the requirements of the PIP were reasonable, he believed others were overwhelming and designed to set him up for failure. (Hughes Dep. at 190.) For example, he testified that the "subjective" tests devised by Dowty and Dennis Hedrick (one of his mentors as part of the PIP) were unfair because he was not tested on what he learned during the training exercises. (Id. at 190, 192.) He was particularly frustrated and skeptical regarding the PIP when Dowty told him to "make up questions" to ask Hedrick during one of the training exercises. (Id. at

191.)[11]  He also testified that he unsuccessfully asked Dowty to retake one of his examinations orally, and that upon asking for a retake on another occasion, Dowty responded "I don't have time for that.  I'm going on vacation."  (Id. at 194–95.)  However, Dowty specifically testified, without contradiction, that Hughes was given three opportunities to take the "certification application quiz" and, on the third attempt, scored 38%.  (Dowty Dep. at 49.)

On June 23, Hughes left work for a period of FMLA leave.  (Hughes Dep. at 202; Doc. 37–18.)  Erin Elliott, HR Generalist at B/E, signed his FMLA designation form on behalf of B/E and indicated that his request for FMLA leave was approved.  (Doc. 37–18 at 1.)  Dr. Jason Thomason completed the health care provider section of the form and indicated that Hughes was scheduled to complete a sleep study before July 15.  (Id. at 3–5.)  Hughes testified that, other than the sleep study, he underwent no treatment during his FMLA leave.  (Hughes Dep. at 206.)  Rather, he had seen results of a medical test showing that his level of anxiety was dangerously high and he felt that taking time off from work would benefit his overall health.  (Id. at 206, 209.)

---

[11] Hughes believed that this statement shows that Dowty did not take the PIP seriously, because he did not think that making up questions when he had none served any legitimate purpose.  (Hughes Dep. at 191.)  Dowty disputes that he ever told Hughes to "make up questions." (Dowty Dep. at 49–50.)  However, the court accepts Hughes' testimony for the purposes of the present motions.

Hughes returned to work on July 19. (Id. at 217.) Upon his return, he received another memorandum from Dowty containing an addendum to the 60-day update he had received on June 7. (Doc. 37-23.) It indicated that Dowty received additional information about instances of unsatisfactory performance while Hughes was out on FMLA leave, including the results of Hughes' "Engineering Frame Specifications quiz." (Id. at 1.) The addendum stated that the final PIP summary would be due on August 12 and that Hughes would be terminated if he did not meet expectations at that time. (Id.)

With respect to his job responsibilities, Hughes testified that, although he returned to the same workstation with the same salary, benefits, and supervisor following his FMLA leave (Hughes Dep. at 217), he was given only one further assignment (id. at 218-19). According to Hughes, instead of his typical job responsibilities, including responding to RFQs, he was given a simple spreadsheet project using basic Microsoft Excel functions. (Id.) He testified that the project was so simple that an intern could have completed it. (Id. at 257.) He further stated that, "[w]hen I returned I would have expected RFQs given to me, and I can't recall any being given to me in the same capacity as when I left." (Id. at 222.) However, he could not identify any RFQs that B/E received after he returned from FMLA leave. (Id.)

B/E submitted a table depicting all RFQs received relating to Hughes' four product lines between June and August of 2010. (Doc. 37-3 at 2-3.) The chart shows that no incoming RFQs were sent to engineering between July 19, when Hughes returned from FMLA leave, and July 27, when he was placed on administrative leave. (Id.) Furthermore, Dowty testified that the Excel project was a portion of a larger assignment that he was responsible for, which he called a "market-share analysis." (Dowty Dep. at 15-16.) He enlisted Hughes' help to complete part of the project. (Id.) Dowty also testified that Hughes had several continuing objectives that he should have been working on upon his return, pursuant to the PIP. (Id.)

Eight days after his return from FMLA leave, Hughes was placed on paid administrative leave. (Doc. 16 ¶ 22.) According to Vaughan, Hughes was placed on administrative leave while his supervisors sought approval from corporate management for his termination. (Vaughan Dep. at 47.) Dowty testified that he recommended Hughes be terminated because of "a long series of events that showed [Hughes] was incapable of doing the job, on top of – once he returned, his disinterest in the job." (Dowty Dep. at 14.) According to Dowty, after returning from FMLA leave Hughes was "[c]onstantly away from his desk, left the facility without telling anyone, [and] didn't complete the assignments he had been given." (Id.) Hughes admittedly had

trouble focusing on everyday tasks at work and did not complete all of the continuous improvement projects outlined in the PIP (Hughes Dep. at 187), and nothing in the record contradicts Dowty's testimony with respect to Hughes' disinterest. Hughes was officially terminated on August 3, 2010. (Doc. 37-17.)

### B. Hughes' replacement at B/E

On June 25, 2010, contemporaneous with Hughes' FMLA leave, B/E posted an open position for an engineer in the seating products group. (Doc. 38-13.) The posting sought an "energetic, self-starter" able to begin employment by July 19. (Id. at 1.) Hughes contends that B/E posted his job as available when he went on FMLA leave and specifically sought a younger person for his position. (Hughes Dep. at 127-29.) However, Dowty testified, without contradiction, that the posting was for a new position which was budgeted in 2009 as a result of increased workload. (Dowty Dep. at 76.) According to Dowty, the new position had nothing to do with Hughes' job and the timing was merely coincidental. (Id. at 76-77.)

B/E filled the position described in the post when it hired LaKeitha Bennett as a temporary employee around the time of Hughes' termination. (Vaughan Dep. at 45; Helmick Dep. at 58-59.) She was eventually hired on a permanent basis on December 6, 2010. (Doc. 38-11.) The individual Defendants all testified, without contradiction, that Tommy Phillips

transferred to Winston-Salem in early 2011, in effect to fill Hughes' position. (Dowty Dep. at 77; Helmick Dep. at 58; Vaughan Dep. at 45.) Both Bennett and Phillips appear to have been under the age of 40 at the time they were hired,[12] while Hughes testified that he was 44 when he was terminated. (Hughes Dep. at 10.)

### C.  Procedural background

Hughes filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on January 25, 2011. (Doc. 37-15.) On his EEOC intake questionnaire, Hughes indicated that Dowty and Helmick were responsible for the discrimination, but made no mention of Vaughan. (Doc. 37-14 at 2.) At his deposition, Hughes testified that he included Vaughan as a defendant in this litigation because Vaughan was the one who officially placed him on administrative leave and, in Hughes' view, caused his termination. (Hughes Dep. at 173-74.)

The EEOC issued Hughes a right-to-sue letter on June 7, 2012. (Doc. 1 ¶ 90; Doc. 16 ¶ 90.) Thereafter, Hughes initiated this lawsuit. Against B/E, Hughes asserts claims under the FMLA for interference and retaliation (first claim),

---

[12] The record is not clear on this point. Bennett's resume indicates that she graduated from college in June of 1998 with a bachelor's degree and began working in 1999. (Doc. 38-12 at 4-5.) Phillips' resume indicates that he graduated from college in December 2006 and began working for B/E in Miami in August 2007. (Id. at 8.) From this information, it appears that both were under the age of 40 in 2010.

under the ADEA for age discrimination (second claim), under the ADA for disability discrimination (third claim), and under North Carolina law for a violation of the public policy against age discrimination (fourth claim).[13]    Against the individual Defendants, Hughes asserts interference and retaliation claims under the FMLA (first claim).    At the conclusion of discovery, all Defendants moved for summary judgment.    (Docs. 33, 35.) Hughes opposes the motions (Docs. 38, 39), and the Defendants have filed replies (Docs. 40, 41).    The motions are now ripe for consideration.

## II.    ANALYSIS

### A.    Standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).    The moving party bears the burden of establishing that no genuine dispute of material fact remains. When the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it shows the absence of material disputed facts.    Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 325 (1986).    "As the Supreme Court has made clear, 'courts should [not] treat discrimination differently from other

---

[13]    Hughes' breach of contract claim against B/E (fifth claim) was voluntarily dismissed on January 23, 2013, and has not been reasserted.    (Doc. 27.)

ultimate questions of fact.'" Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 295 (4th Cir. 2010) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In assessing whether a genuine dispute of material fact sufficient to preclude summary judgment exists, the court regards the non-movant's statements as true and accepts all admissible evidence and draws all inferences in the non-movant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But a non-moving party must establish more than the "mere existence of a scintilla of evidence" to support his position. Id. at 252. If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). Ultimately, summary judgment is appropriate where the non-movant fails to offer "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## B. FMLA claims

### 1. Interference

The FMLA provides, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the attempt to exercise, any right under this chapter." 29 U.S.C. § 2615(a)(1). One right enjoyed by employees under the FMLA is the ability to take "a total of 12 workweeks of leave during any 12-month period," without risk of losing one's job, for any number of reasons,

including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." Id. §§ 2612(a)(1), (a)(1)(D). The statute requires that after taking leave, the employee must be restored to his former position or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." Id. § 2614(a)(1)(B).

As the Fourth Circuit has explained, these substantive rights guaranteed by the FMLA are *prescriptive*, as opposed to the *proscriptive* provisions protecting employees from discrimination and retaliation for exercising substantive rights under the FMLA. See Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 546 (4th Cir. 2006); cf. 29 U.S.C. § 2615(a)(2) (prohibiting discrimination and retaliation). An "interference" claim exists only when the employer takes an affirmative action to prevent or restrain the employee's ability to exercise his substantive rights under the FMLA.

This limitation is evidenced by the elements of the claim. "To establish unlawful interference with an entitlement to FMLA benefits, an employee must prove that: (1) [he] was an eligible employee; (2) [his] employer was covered by the statute; (3) [he] was entitled to leave under the FMLA; (4) [he] gave [his] employer adequate notice of [his] intention to take leave; and (5) the employer denied [him] FMLA benefits to which [he] was

entitled." Ijames v. Autumn Corp., No. 1:08CV777, 2009 WL 2171252, at *8 (M.D.N.C. July 20, 2009) (quoting Rodriguez v. Smithfield Packaging Co., 545 F. Supp. 2d 508, 516 (D. Md. 2008)); accord Edgar v. JAC Prods., Inc., 443 F.3d. 501, 507 (6th Cir. 2006). Without evidence that an employee was denied a substantive right secured by the FMLA, the fifth element of an interference claim cannot be satisfied.

In this case, it is undisputed that Hughes was granted FMLA leave, took a leave of absence for approximately three weeks, and returned to the same workstation, supervisor, salary, and benefits. Hughes' contention that he was not returned to the same or equivalent job is belied by the record. He argues that he was not working on RFQs when he returned and instead was assigned to a mundane spreadsheet project. However, Defendants introduced uncontroverted evidence that no RFQs were sent to engineering between Hughes' return to work and his placement on administrative leave. Moreover, Hughes had other, ongoing assignments related to the PIP, and the spreadsheet assignment was part of a larger project that Vaughan and Dowty were working on. Simply put, there is no record evidence to support Hughes' claim that he was not returned to the same job for eight days

following his FMLA leave.   Therefore, Defendants' motions for summary judgment on this claim will be granted.[14]

## 2.   Retaliation

FMLA retaliation claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973).   See Yashenko, 446 F.3d at 550-51.   In order to prevail on his FMLA retaliation claim, Hughes first must make a *prima facie* showing that (1) he engaged in protected activity under the FMLA, (2) B/E took adverse action against him, and (3) the adverse action was causally connected to Hughes' assertion of FMLA rights.   Id. at 551 (citing Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998)).   Should Hughes produce sufficient *prima facie* evidence, the burden of production shifts to B/E to articulate a legitimate, non-retaliatory explanation for Hughes' termination.   Id.   If B/E satisfies this burden, Hughes retains the ultimate "burden of establishing that [B/E's] proffered explanation is pretext for FMLA retaliation."   Id.

---

[14] The court notes that Hughes effectively abandoned the interference claim in his response brief.   Hughes' FMLA argument conflates the interference and retaliation claims, treating them as the same claim. The only authority cited in the section, Blohm v. Dillard's Inc., 95 F. Supp. 2d 473 (E.D.N.C. 2000), is an FMLA retaliation case, and the heading of the FMLA section of Hughes' brief reads "[B/E] violated the Plaintiff's rights under the FMLA when Defendant [B/E] *terminated* the employment of the Plaintiff."   (Doc. 38 at 8 (emphasis added).)   As noted above, Hughes' termination may create a retaliation claim, but it does not establish an interference with Hughes' attempt to exercise his substantive rights under the FMLA.   See Yashenko, 446 F.3d at 546. In fact, Hughes exercised those rights fully before he was terminated.

(quoting Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001)).

The first two elements of Hughes' *prima facie* case are not in dispute; the parties agree that Hughes exercised his right to take FMLA leave beginning on June 23, 2010, returned to work on July 19, was placed on administrative leave on July 27, and was ultimately terminated on August 3. With respect to Hughes' *prima facie* case, the only contested element is causation.

B/E argues that Hughes' termination was not causally related to his FMLA leave because his performance issues and the threat of termination predated any exercise of FMLA rights. The Fourth Circuit has not determined whether plaintiffs in FMLA retaliation cases must prove but-for causation to prevail, cf. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013) (but-for causation required to prevail on retaliation claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.); Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 180 (2009) (but-for causation required to prevail on ADEA claim), or whether retaliation must be only a motivating factor in the employer's termination decision, cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989) (superseded by 42 U.S.C. § 2000e-2(m)) (recognizing mixed-motive cause of action under Title VII). See Averette v. Diasorin, Inc., No. 3:11CV203, 2011 WL 3667218, at *3 (W.D.N.C. Aug. 22, 2011) (noting the lack of

Fourth Circuit precedent).  The court need not resolve this issue, however, because Hughes' argument is ultimately unsuccessful even under the "motivating factor" analysis.

Applying the less stringent "motivating factor" standard, the undisputed evidence allows Hughes to meet "the less onerous burden of making a *prima facie* case of causality." Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (quoting Williams v. Cerberonics, Inc., 871 F.3d 452, 457 (4th Cir. 1989)).  In many cases, temporal proximity between termination and protected activity under a non-discrimination statute is sufficient to make out *prima facie* causation under McDonnell Douglas.  See, e.g., Hoyle, 650 F.3d at 337 (reassignment and then termination within two months of reporting harassment sufficient under Title VII); King v. Rumsfeld, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (termination two months and two weeks after protected activity sufficient under Title VII).  In Hoyle, the plaintiff was ostensibly fired for violating a "last chance agreement" designed to remedy her chronic absenteeism.  650 F.3d at 327-28.  Despite significant evidence that she was terminated for repeatedly calling in sick to work, the Fourth Circuit held that the plaintiff could satisfy her *prima facie* burden based upon the temporal proximity between her reporting alleged sexual harassment and being reassigned and later terminated.  Id. at 337.  The plaintiff's claim ultimately failed, however, because

she produced no evidence that the employer's proffered reason for taking the actions was pretext for retaliation. Id. at 337–38. The temporal proximity in this case is even closer; Hughes was placed on administrative leave eight days after returning from FMLA leave and was terminated shortly thereafter. Therefore, the court concludes that Hughes has satisfied his *prima facie* burden on the retaliation claim.

However, this presumption is rebutted by the record evidence of a non-retaliatory reason for Hughes' termination. As B/E points out, there is ample, uncontroverted evidence in the record showing that the cause of Hughes' termination predates any decision on his part to take FMLA leave. Hughes was aware of the possibility of termination as early as February 22, 2010, when he signed and commented on his calendar year 2009 performance appraisal. Helmick testified that she first discussed termination in connection with the issuance of the PIP, which was contemporaneous with his 2009 performance appraisal. (Helmick Dep. at 26–27, 45.) Moreover, Hughes was alerted via memorandum on June 7 – more than two weeks prior to the beginning of his FMLA leave period – that his performance was deteriorating and that his scores on various assessments were below the acceptable level. Additional evidence of Hughes' failure to make satisfactory progress on assessments came to

light during his FMLA leave, specifically his performance on the "Engineering Frame Specifications quiz."

This evidence satisfies B/E's burden of production, and Hughes has produced no evidence that the reason for termination proffered by B/E was pretext for retaliation. Moreover, it was Helmick who initially suggested, at their January 25, 2010, meeting, that Hughes take a leave of absence to take care of his health issues. At that point, Hughes declined. Performance issues continued to surface up to and including the period of Hughes' FMLA leave, and there is no indication that B/E or any individual discouraged FMLA leave. In short, there is no evidence in the record that Hughes' decision to take FMLA leave was a motivating factor in B/E's decision to terminate his employment. Thus, Defendants' motions for summary judgment will be granted on this claim.[15]

## C.  ADA claims

### 1.  Disability discrimination

Without direct evidence, Hughes' claim of disability discrimination is also evaluated under the McDonnell Douglas burden-shifting framework. See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995). To establish

---

[15] Hughes also names the individual Defendants as defendants on both FMLA claims, arguing that they each qualify as an "employer" under the statute. However, the court need not determine the issue of individual liability in this case because all of Hughes' FMLA claims have been dismissed on the merits.

a *prima facie* wrongful discharge claim under the ADA, Hughes must show that (1) he "was a qualified individual with a disability," (2) he was terminated, (3) he "was fulfilling [B/E's] legitimate expectations at the time of discharge," and (4) "the circumstances of [his] discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (quoting Rohan v. Networks Presentations LLC, 375 F.3d 266, 273 n.9 (4th Cir. 2004)). As with the FMLA retaliation claim, if Hughes is successful, the burden shifts to B/E to articulate a legitimate non-discriminatory reason for the termination. Ennis, 53 F.3d at 58. If B/E meets this burden, the *prima facie* presumption "'drops out of the picture,' and [Hughes] bears the ultimate burden of proving that [he] has been the victim of intentional discrimination." Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).

B/E argues that Hughes cannot make out a *prima facie* case because he was not meeting B/E's legitimate expectations. Hughes cites no authority on point with respect to his ADA claim,[16] but claims that B/E originally made its determination

---

[16] The only authority cited in the brief in support of Hughes' ADA claim is Norman v. Beasley Mezzanine Holdings, LLC, 826 F. Supp. 2d 875 (E.D.N.C. 2011), an FMLA retaliation case not applicable to any claim under the ADA. The brief cites no relevant legal authority in support of Hughes' ADA claim and is therefore in violation of L.R. 56.1(e). The court could grant B/E's motion on this ground alone but will address the merits of Hughes' claims.

that he was not performing at a satisfactory level while he was suffering from a disability, then did not give him an opportunity to perform his job upon his return from FMLA leave.

The court need not determine whether Hughes was disabled under the ADA, because it is undisputed that he was not meeting B/E's legitimate expectations at the time of his discharge. During his two-and-a-half years employed at B/E, he never received a performance evaluation at or above the "meets expectations" level. His 2009 evaluation, which resulted in the issuance of the PIP, was below the "needs further development" threshold. Furthermore, Hughes admitted in his comments on his performance appraisal, as well as at his deposition, that he was performing at a substandard level. He admitted that he had provided inaccurate RFQ estimates (Hughes Dep. at 239) and that he failed to complete the requirements of the PIP. Critically, he was rated a 1 out of 4 on his 2009 performance appraisal in the category of "Job Knowledge," and Dowty commented that some of his noted deficiencies were (1) "[h]is unfamiliarity and lack of proficiency with the Boeing and Airbus frame specifications as they relate to aircraft interior design," and (2) "[b]asic certification requirements of seating," among others. (Doc. 37–16 at 3.) There was no evidence that Hughes' performance improved once he returned from FMLA leave; rather, more evidence of substandard performance surfaced, and Hughes did not complete

the requirements of the PIP. Therefore, no reasonable juror could find that Hughes was meeting B/E's legitimate expectations when he was placed on administrative leave and later terminated. Because Hughes cannot establish a *prima facie* case, his disability discrimination claim fails.

### 2. Failure to accommodate

Hughes also argues that B/E violated the ADA by failing to grant him an accommodation. The ADA requires an employer to make "reasonable accommodations" unless the employer can demonstrate that such accommodation "would impose an undue hardship on the operation of the business . . . ." 42 U.S.C. § 12112(b)(5). In order to establish a *prima facie* claim for failure to accommodate, Hughes must show that (1) he had a disability under the meaning of the ADA, (2) B/E had notice of his condition, (3) "with reasonable accommodation he could perform the essential functions of the position"; and (4) B/E refused to make the reasonable accommodation. <u>Wilson v. Dollar Gen. Corp.</u>, 717 F.3d 337, 345 (4th Cir. 2013) (quoting <u>Rhodes v. FDIC</u>, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

The court will assume, without deciding, that the first two elements of the claim have been established. B/E does not argue that Hughes was not disabled, and neither party has briefed whether, in Hughes' case, hypoxia or sleep apnea would qualify as a disability under the ADA. There is no dispute that B/E had

notice of Hughes' condition.  In any event, Hughes' claim fails because he has not produced sufficient evidence regarding either of the final two elements.

Hughes "bears the burden of identifying an accommodation that would allow a qualified individual to perform the job, as well as the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." Shin v. Univ. of Md. Med. Sys. Corp., 369 F. App'x 472, 481 (4th Cir. 2010) (citing Halperin v. Abacus Tech. Corp., 128 F.3d 191, 197 (4th Cir. 1997)).  Hughes requested only one accommodation throughout the entire relevant period:  he asked that his job be restructured and that responsibility for three of his four product lines be transferred to his coworkers.  Dowty denied Hughes' request because it would unduly burden the other members of his group.

In Crabill v. Charlotte Mecklenburg Board of Education, 423 F. App'x 314, 323 (4th Cir. 2011), the Fourth Circuit held that an accommodation that would shift the plaintiff's duties to other workers in the plaintiff's department, thereby increasing the coworkers' workloads, is unreasonable.  The court noted that the ADA does not require an employer to assign an employee "permanent light duty." Id. (quoting Carter v. Tisch, 822 F.2d 465, 467 (4th Cir. 1987)) (applying the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.)); accord Mason v. Avaya Commc'ns,

Inc., 357 F.3d 1114, 1121 n.3 (10th Cir. 2004) ("[A]n accommodation that would require other employees to work harder is unreasonable."); Rehrs v. Iams Co., 486 F.3d 353, 357 (8th Cir. 2007) ("Under the ADA, an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated."); see also 29 C.F.R. § 1630.2(p)(2)(v) (one factor to consider in determining whether granting an accommodation would create undue hardship on the employer is "the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business"). Because there were only four employees performing Hughes' job function (Hughes Dep. at 89), the effect of reallocating three of Hughes' four product lines to his coworkers would have been pronounced.[17] Such an accommodation would have significantly added to the job responsibilities of the other workers in the seating products group. It is therefore not required by the ADA.

Furthermore, Hughes has not produced sufficient evidence for a reasonable juror to conclude that he would have been able to perform his job even with the requested accommodation. The record evidence shows that Hughes was unable to score at acceptable levels on three out of five examinations given

[17] Dowty stated that there was only one other engineer in the seating products group, and the other engineer was responsible for eleven product lines. (Doc. 37-6 ¶¶ 5-6.)

pursuant to the PIP. According to Dowty, the results illustrated a lack of understanding of the basic concepts required to perform his job effectively. Hughes possessed no experience in the aerospace industry prior to coming to B/E, a fact he readily admits. Significantly, Hughes failed to score at the "meets expectations" level on any job evaluation while employed at B/E, including evaluations by Hastings and Kash before Hughes began experiencing any symptoms. Therefore, the court concludes that, as a separate and independent ground for the decision, Hughes has not demonstrated that he could perform the essential functions of the job with a reasonable accommodation. Having failed to satisfy either the third or the fourth element of his failure to accommodate claim, Hughes' claim cannot survive summary judgment.

### D.   ADEA and North Carolina public policy claims

In order to establish a *prima facie* case of age discrimination in a discharge case under the ADEA, Hughes must show that he was (1) a member of the protected class, (2) qualified for the position and meeting the employer's legitimate expectations, (3) terminated despite his qualifications and performance, and (4) replaced by someone with comparable qualifications outside the protected class. <u>Causey v. Balog</u>, 162 F.3d 795, 802 (4th Cir. 1998). The <u>McDonnell Douglas</u> framework applies in this context as well. <u>See</u> <u>Rowe v. Marley</u>

Co., 233 F.3d 825, 829 (4th Cir. 2000). If Hughes is successful in proving a *prima facie* case, then B/E must articulate a legitimate, non-discriminatory reason for the termination. Id. Hughes retains the ultimate burden to prove that B/E's proffered reason was actually pretext for unlawful age discrimination. Id. He must prove that his age was the but-for cause of his termination. Gross, 557 U.S. at 180. The North Carolina courts, construing the state public policy announced in N.C. Gen. Stat. § 143-422.2, have held that this framework applies in cases brought under state law as well. See N.C. Dep't of Corr. v. Gibson, 301 S.E.2d 78, 82–83 (N.C. 1983).

For the reasons discussed above, see supra Part II.C.1., Hughes cannot establish a *prima facie* case of age discrimination because the undisputed evidence in the record shows that he was not performing at a level consistent with B/E's legitimate expectations. Therefore, the court will grant B/E's motion for summary judgment on the age discrimination claims on this basis.

Furthermore, even if Hughes were able to make a *prima facie* showing, his claim would fail because he has not produced any evidence from which a reasonable jury could infer that B/E's explanation was actually pretext for age discrimination. The only evidence in the record concerning this issue is that B/E's job posting sought somebody who was an "energetic, self-starter" for a position in the seating products group, and that the two

people hired in the period following Hughes' termination appear to have been outside of the protected class.[18]   Contrary to Hughes' assertions, "energetic" is not a synonym for "young," nor does it necessarily imply youth.   According to Merriam-Webster's dictionary, "energetic" means "operating with force, vigor, or effect."   Webster's Third New International Dictionary at 751 (1986).   And according to Roget's Thesaurus, "young" is not listed among 40 possible synonyms for "energetic," which include "active," "enterprising," "lively," and "industrious." See       Energetic       Entry,       Thesaurus.com, http://thesaurus.com/browse/energetic  (last  visited  Mar.  7, 2014).   As Hughes concedes, persons of any age may act in an energetic or lethargic manner.  (Hughes Dep. at 128-29.)   There is no evidence in the record that any of Hughes' supervisors attributed his performance issues to his age or considered age at all in the decision to terminate him or to hire Bennett and Phillips.   Therefore, a reasonable jury could not conclude that B/E's proffered explanation for Hughes' termination was pretext for age discrimination, and B/E's motion for summary judgment will be granted.

**E.   Defendants' request for attorneys' fees and costs**

At the end of their briefs, Defendants request an award of

---

[18]  The ADEA protects employees who are at least 40 years of age.   29 U.S.C. § 631(a).

attorneys' fees and costs, albeit without any argument or citation to authority. (Doc. 34 at 20; Doc. 36 at 10.) Under the ADA, the court may, in its discretion, award attorneys' fees and costs to a prevailing party other than the United States. 42 U.S.C. § 12205. The other statutes allow a court to award attorneys' fees and costs to prevailing plaintiffs only. See 29 U.S.C. §§ 626(b), 216(b) (ADEA); 29 U.S.C. § 2617(a)(3) (FMLA). Federal Rule of Civil Procedure 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs -- other than attorney's fees -- should be allowed to the prevailing party."

Defendants have made no showing that they are entitled to attorneys' fees under the ADA. A district court may award attorneys' fees to a prevailing defendant upon a finding that the plaintiff's action was "frivolous, unreasonable, or without foundation." See Davis v. Balt. Hebrew Congregation, __ F. Supp. 2d __, 2013 WL 6206993, at *12 (D. Md. Nov. 27, 2013) (citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978) (Title VII) and Brown v. Lucky Stores, Inc., 246 F.3d 1182, 1190 (9th Cir. 2001) (ADEA)). Here, while Hughes' claims were unsuccessful, the court cannot conclude that they were frivolous as a matter of law. Therefore, Defendants' request for an award of attorneys' fees will be denied.

However, Rule 54(d) creates a general presumption that costs, other than attorneys' fees, should be awarded to the prevailing party. See Cherry v. Champion Int'l Corp., 186 F.3d 442, 446 (4th Cir. 1999). Unless a federal statute provides otherwise, "[c]osts may be denied to the prevailing party only when there would be an element of injustice in a presumptive cost award." Id. Despite fee-shifting provisions in the statutes, some courts have allowed prevailing defendants to recover costs in FMLA and ADEA cases. See, e.g., Billings v. Cape Cod Child Dev. Program, 270 F. Supp. 2d 175, 177-78 (D. Mass. 2003) (concluding that FMLA's fee-shifting provision does not displace Rule 54(d)'s general presumption); Herold v. Hajoca Corp., 682 F. Supp. 297, 301 (W.D. Va. 1988) (prevailing defendants in ADEA cases "may recover only those costs set forth in 28 U.S.C. § 1920"). The court concludes that a presumptive award would not be unjust here and that Defendants may therefore file a bill of costs pursuant to Local Rule 54.1 to recover costs allowable under 28 U.S.C. § 1920.

## III. CONCLUSION

For the reasons stated, the court concludes that Hughes has not produced sufficient evidence to overcome a motion for summary judgment on his FMLA, ADA, ADEA, and North Carolina public policy claims.

IT IS THEREFORE ORDERED that the motions for summary judgment by B/E (Doc. 33) and the individual Defendants (Doc. 35) are GRANTED and that the case is DISMISSED WITH PREJUDICE. Costs shall be awarded to Defendants.

                              /s/   Thomas D. Schroeder
                              United States District Judge

March 7, 2014